RECORD NUMBER: 14-2027

# United States Court of Appeals

*for the*

# Fourth Circuit

**WESTFIELD INSURANCE COMPANY,**

*Plaintiff/Appellee,*

– v. –

**CARPENTER RECLAMATION, INC., a West Virginia Corporation,**

*Defendant/Appellant,*

**and**

**THE BOARD OF EDUCATION OF GREENBRIER COUNTY, WEST VIRGINIA, a statutory corporation,**

*Defendant,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

# BRIEF OF APPELLEE

**BRENT K. KESNER**
**KESNER & KESNER, PLLC**
**P.O. Box 2587**
**Charleston, WV 25329**
**bkesner@kesnerlaw.com**
**(304) 345-5200**

*Counsel for Plaintiff/Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-2027__     Caption: __Westfield Insurance Company v. Carpenter Reclamation, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Westfield Insurance Company__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?                              ☑ YES ☐ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
     Ohio Farmers Insurance Company is the parent company of Westfield Insurance Company.

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                     ☐ YES ☑ NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____10/01/14_____

Counsel for: Westfield Insurance Company

## CERTIFICATE OF SERVICE
****************************

I certify that on _____10/01/14_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Carl J. Roncaglione, Jr., Esq.
1018 Kanawha Boulevard, E.
Charleston, West Virginia 25301

_____          _____10/01/14_____
        (signature)                              (date)

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF THE ISSUES........................................................... 1

STATEMENT OF THE CASE .............................................................. 2

SUMMARY OF ARGUMENT ........................................................... 17

ARGUMENT ..................................................................................... 20

   I.  STANDARD OF REVIEW ......................................................... 20

   II. DISCUSSION............................................................................ 21

      A. The District Court properly found that Westfield had no duty to
         defend or indemnify Carpenter under the subject Commercial
         General Liability Policy .................................................... 21

          *1. The BOE did not allege any "property damage" or
              "occurrence" which would trigger coverage under the
              Westfield Policy* .................................................... 22

          *2. Coverage for the BOE's claims is also expressly excluded
              under the terms of the Westfield Policy..* ........................... 36

          *3. The sub-contractor exception relied upon by Carpenter does
              not apply because there was no property damage alleged and
              Carpenter did the drilling which controlled the depth to which
              the blasting was done.* ............................................ 38

      B. Carpenter mischaracterizes the testimony of Westfield employee
         Judy (McConkey) Ellis.................................................. 41

C.  Carpenter's arguments regarding discovery issues and alleged misconduct by Westfield and its counsel are unsupported and irrelevant to the coverage issues presented in this appeal ...................... 44

    *1.  Westfield has not asserted advice of counsel as a defense or otherwise waived its claims of privilege with respect to its communications with counsel regarding the coverage issues* ........... 45

    *2.  The communications at issue are irrelevant to the determination of the coverage issues* ................................................. 51

D.  There was no evidence to support Carpenter's claims for "bad faith" and violations of the Unfair Trade Practices Act or its claims for punitive damages and the District Court properly granted Westfield summary judgment with respect to those claims ................... 52

CONCLUSION AND REQUEST FOR ORAL ARGUMENT ............................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

## Cases

*Aetna Cas. & Sur. Co. v. Pitrolo*, 176 W. Va. 190, 342 S.E.2d 156 (1986) .... 21, 53

*Aluise v. Nationwide Mut. Fire Ins. Co.*,
    218 W. Va. 498, 625 S.E.2d 260 (2005) ................................................ 26, 27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................................... 21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................... 20

*Cherrington v. Erie Ins. Prop. & Cas. Co.*,
    231 W. Va. 470, 745 S.E.2d 508 (2013) ............................................... *passim*

*Farmers & Mechs. Mut. Ins. Co. v. Cook*,
    210 W. Va. 394, 557 S.E.2d 801 (2001) ...................................................... 21

*In re Grand Jury Proceedings*, 33 F.3d 342 (1994) ........................................ 50, 51

*Green v. Farm Bureau Mut. Auto. Ins. Co.*,
    139 W. Va. 475, 80 S.E.2d 424 (1954) .................................................. 21, 22

*Hayseeds, Inc. v. State Farm Fire & Cas.*,
    177 W. Va. 323, 3525 S.E.2d 73 (1986) ................................................ 53, 54

*Hickman v. Taylor*, 329 U.S. 495 (1947)............................................................... 45

*Horace Mann Ins. Co. v. Leeber*,
    180 W. Va. 375, 376 S.E.2d 581 (1988) ......................................... 21, 22, 25

*Jordache Enters., Inc. v. Nat'l Union Fire Ins. Co.*,
    204 W. Va. 465, 513 S.E.2d 692 (1998) ...................................................... 53

*McCormick v. Allstate Ins. Co.*, 202 W. Va. 535, 505 S.E.2d 454 (1998)............. 54

*Nicholas v. Bituminous Cas. Corp.*,
    235 F.R.D. 325 (N.D. W. Va. 2006) ......................................... 45, 48, 49, 51

*Sheetz, Inc. v. Bowles Rice McDavid Graff & Love*,
209 W. Va. 318, 547 S.E.2d 256 (2001) ..................................................... 48

*Soliva v. Shand, Morahan & Co.*, 176 W. Va. 430, 345 S.E.2d 33 (1986) ............ 21

*State Bancorp, Inc. v. U.S. Fid. & Guar. Ins. Co.*,
199 W. Va. 99, 483 S.E.2d 228 (1997) ..................................................... 24

*State ex rel. Allstate Ins. Co. v. Gaughan*,
203 W. Va. 358, 508 S.E.2d 75 (1998) ................................................. 46, 47

*State ex rel. Allstate Ins. Co. v. Madden*,
215 W. Va. 705, 601 S.E.2d 25 (2004) ..................................................... 47

*State ex rel. Erie Ins. Prop. & Cas. Co. v. Mazzone*,
218 W. Va. 593, 625 S.E.2d 355 (2005) ................................................... 48

*State ex rel. Montpelier US Ins. Co. v. Bloom*, 757 S.E.2d 788 (W. Va. 2014) ..... 49

*State ex rel. Shroades v. Henry*, 187 W. Va. 723, 421 S.E.2d 264 (1992) ............ 45

*Sylvia Dev. Corp. v. Calvert County Md.*, 48 F.3d 810 (4th Cir. 1995) ................. 20

*Tennant v. Smallwood*, 211 W. Va. 703, 568 S.E.2d 10 (2002) ........................... 22

*Upjohn Co. v. U.S.*, 449 U.S. 383 (1981) .............................................. 46

*W. Va. Fire & Cas. Co. v. Stanley*, 216 W. Va. 40, 602 S.E.2d 483 (2004) .... 23, 33

## **Rules:**

*Fed. R. Civ. P. 26(b)(1)* ................................................................... 48

*Fed. R. Civ. P. 26(b)(3)* .............................................................. 50, 51

*Fed. R. Civ. P. 56(a)* .................................................................... 20

*Fed. R. Civ. P. 56(c)* .................................................................... 21

*Fed. R. Civ. P. 56(d)* ............................................................................... 21

*W. Va. R. Civ. P. 10(c)* .......................................................................... 27

v

## JURISDICTIONAL STATEMENT

Jurisdiction is uncontested. Plaintiff-Appellee Westfield Insurance Company ("Westfield") filed this declaratory action against Carpenter Reclamation, Inc. ("Carpenter"), pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201.  Westfield is an Ohio Corporation and Carpenter Reclamation, Inc. is a West Virginia corporation.  For purposes of jurisdiction, it is undisputed that there was complete diversity of the parties and the amount in controversy was over $75,000.00.  The District Court entered summary judgment on September 17, 2014 and this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.    Whether the District Court properly granted summary judgment when there is no genuine question of fact material to the duties of Westfield under the subject Policy.  Specifically, whether the District Court correctly found that Carpenter was not entitled to a defense or indemnification from Westfield for claims being asserted against Carpenter by the Greenbrier County Board of Education arising from the construction of an elementary school in light of the fact that said claims did not involve property damage caused by an occurrence.

II.    Whether the Magistrate Judge properly denied Carpenter's request to compel Westfield to produce various attorney-client communications which Carpenter had sought in discovery.

## STATEMENT OF THE CASE

Westfield filed the present action to seek a declaration from the Court as to its duties and obligations under a policy of insurance issued to Carpenter. Westfield asserts that it has no duty to defend or indemnify Carpenter with respect to claims arising from work Carpenter performed during the site preparation for the construction of the Lewisburg, WV Elementary School. (See generally, the Complaint For Declaratory Relief at JA 38-62.) In responding to Westfield's Complaint, Carpenter filed a counterclaim, asserting claims for breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, bad faith and punitive damages. (See generally, the Counterclaim at JA 76-112.)

*The Underlying Litigation*

The underlying case, Civil Action No. 13-C-15, was filed by the Greenbrier County Board of Education (the "BOE"), in the Circuit Court of Greenbrier County, West Virginia.  JA 219-225. The BOE's Petition was styled as a Petition for Declaratory Relief and Award(s) for Breach of Contract and named as Defendants Carpenter, Swope Construction Company ("Swope"), Dougherty

2

Company, Inc. ("Dougherty") and Western Surety Company ("Western"). JA 219. The Petition alleged that the BOE entered into a construction contract with Swope on January 3, 2011, for the construction of a new elementary school. JA 220. The BOE further alleged that it entered into a plumbing construction contract with Dougherty on January 3, 2011, for plumbing service and equipment for the new school. JA 220. The BOE alleged that it entered into a contract with Carpenter on February 15, 2010, for site clearing and demolition, stock piling, top soil stripping, earth work, rock excavation, reduction of particle size, excavation, compacted fill, remediation/back fill of existing site sink holes, erosion and sediment control, site storm drainage, establishment of sub-grade for future building and roadways and parking, establishment of finished grade for physical education play fields, spreading of top soil on specified portions of the site, and mulching of specified portions of the site, for the sum of $1,198,000.00. JA 221. Finally, the BOE alleged that Western provided a performance bond for the performance of Carpenter's work. JA 221.

According to the Petition, the early site work for the contract required the site to be  excavated to an elevation of 2,188.83 feet, which is 3 ½ feet below floor subgrade and slightly below the foundation of the subgrade. JA 222. The contract and specifications were attached to the Petition as an exhibit and incorporated by

reference.  JA 221.  The Petition went on to allege that Swope had asserted that

Carpenter, in its site work preparation, had excavated to a depth deeper than that

required by the project specifications, with excess excavation of up to 9 feet.  JA

222.  According to the BOE, Swope advised that it was required to provide

services and material to correct the non-conforming work of Carpenter in order to

proceed with the performance of its contract.  JA 222.  The Project engineer E.T.

Boggess Architects, Inc. allegedly provided notice of non-conforming work to

Carpenter, and Dougherty reportedly asserted that Carpenter's excavation to a

depth deeper than required by the project specifications also required Dougherty to

provide additional services  and material to complete its work.  JA 222.  The BOE

further alleged that Swope and E.T. Boggess determined that Carpenter had not

remediated the deficiencies noted in the non-conforming work notice.  JA 222.

　　　The Petition alleged that Swope had provided notice that additional expenses

of $212,645.42 would be necessary to complete Carpenter's non-confirming work,

necessary to permit Swope to proceed with the construction of the school, and

Dougherty indicated that it needed an additional $10,586 to proceed with the

plumbing work due to Carpenter's non-conforming excavation work.  JA 222-223.

The BOE also alleged that Carpenter received payment under its contract of

$1,125,260, and had made a demand for an additional $87,138.00 due from the

4

BOE. JA 223. In addition, Carpenter was alleged to have installed a liner which was defective and which cost $14,100.00 to replace. JA 223. Finally, the BOE alleged that it was required to spend $5,800.00 for evaluations of Carpenter's allegedly non-conforming work and testing of Carpenter's work. JA 223. The BOE sought a declaratory judgment regarding the conflicting claims of Swope, Dougherty, and Carpenter as well as judgment against Carpenter and Western for any amounts which the Circuit Court determined that Swope and Dougherty were entitled to receive for repair of Carpenter's non-conforming work, including retention of Carpenter's retainage held by the BOE. JA 224-225.[1]

*Westfield's Handling Of The Claim*

At the time of Carpenter's work, Carpenter was the named insured under Westfield Policy No. TRA-4593575, with effective dates of coverage of December

_____

[1] The BOE subsequently filed an Amended Petition which sought additional declaratory relief but did not contain any substantially new or different allegations of wrongdoing by Carpenter. (See JA 226-254.)

1, 2010 through December 1, 2011. (See JA 256-413, the Westfield Policy[2].) The

Policy provides, in relevant part, as follows:

**COMMERCIAL GENERAL**

**LIABILITY COVERAGE FORM**

**\*\*\***

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.      Insuring Agreement**

**a.**     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

**\*\*\***

**b.**     This insurance applies to "bodily injury" and "property damage" only if:

**(1)**    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"

---

[2] Due to the voluminous nature of the complete Westfield Policy, only those coverage parts dealing with the Commercial General Liability Coverage and the Umbrella Coverage are addressed. Those portions of the Policy which are irrelevant to the matters in dispute (Commercial Auto, Inland Marine, etc.) have not. In addition, for ease of reference, excerpts from the Policy setting forth only the relevant Policy language can be found at JA 414-429.

6

**2.     Exclusions**

This insurance does not apply to:

**a.     Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b.     Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

> **(1)**     That the insured would have in the absence of the contract or agreement; or

> **(2)**     Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

***

**j.     Damage To Property**

"Property damage" to:

***

> **(5)**     That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

7

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

\*\*\*

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k.    Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**I.    Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.    Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

\*\*\*

8

## SECTION V - DEFINITIONS

\*\*\*

**3.**     "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

\*\*\*

**8.**     "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

**a.**     It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.**     You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

\*\*\*

**13.**     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\*\*\*

**17.**     "Property damage" means:

**a.**     Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

9

**b.**     Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*** 

## CONTRACTORS GENERAL LIABILITY EXPANDED PLUS ENDORSEMENT

This endorsement modifies insurance provided under the following:

## COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**1.**     **SECTION I - COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY** is amended as follows:

Item **2. Exclusions a.** is deleted and replaced with the following:

**a.**     **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force for the purpose of protecting persons or property.

***

Item **2. Exclusions I.** is deleted and replaced with the following:

**I.**     **Damage To Your Work**

"Property damage" to "your work" arising out of it and included in the "products-completed operations hazard".

10

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

This exclusion only applies to that particular part of "your work" out of which the damage arises.

The last paragraph of item **2. Exclusions** is deleted and replaced with the following:

Exclusions **c.** through **n.** do not apply to damage by fire or explosion to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** - LIMITS OF INSURANCE.

\*\*\*

(See JA 256-413 for the complete language of those portions of the Policy and the excerpts of relevant Policy language found at JA 414-429.)

Even before the BOE filed its Petition, Carpenter had placed Westfield on notice of potential claims arising out of Carpenter's work on the project. Westfield investigated by having an expert, Roy Sexton, review the project file, contact its insured and the other parties, visit the site, and review the plans and blueprints. (See Westfield's computerized claim diary at Notes 40-44, JA 876-877.) Mr. Sexton advised Westfield that the engineers for the site work (identified as Terradon) had told him that the School Board felt that the "GC" (the general contractor, Swope) was responsible while the "GC" contended that Carpenter was responsible. (See JA 877

11

at note 44.)   After investigating the conflicting allegations regarding who was responsible for the additional construction expenses, Westfield advised Carpenter that such allegations might not be covered under the Westfield Policy.  (See Westfield claim representative Judy McConkey's March 30, 2012 letter, JA664- 671.) Significantly, Westfield noted that no claim or lawsuit had been filed (JA 664) and reserved all of its rights under the Policy in the event a claim were to later arise.  JA 671.

Once the BOE's Petition was filed, Carpenter placed Westfield on notice and Westfield again advised Carpenter that the claims did not appear to be covered.  (See Judy McConkey's February 22, 2013 letter, at JA 503-510.)   After Carpenter's attorney expressed his disagreement with Westfield's position, Westfield sent a more detailed letter to fully address his concerns and the coverage issues.  (See Judy McConkey's May 7, 2013 letter to attorney Roncaglione, at JA 511-533.)

*The Declaratory Action*

Westfield filed its Complaint for Declaratory Relief in this action on May 31, 2013, and the Court entered its initial Order and Notice on June 18, 2013.  Carpenter appeared in the case on June 19, 2013 and, on July 23, 2013, served its First Set of Interrogatories and Request for Production of Documents to Westfield Insurance Company. (See the Docket Sheet JA 4 at Item No. 17.)  Pursuant to a stipulation,

12

Westfield served timely responses to Carpenter's discovery requests on September 19, 2013.  (See JA 7 at Item No. 38, reflecting service of Westfield's Responses.)

On October 15, 2013, Carpenter served its Motion To Compel, asserting that Westfield and its counsel had acted improperly and demanding that the Court compel Westfield to provide further responses and sanction the Westfield by awarding it attorney's fees and costs. In the alternative, Carpenter asked the Court to take the extreme measure of striking Westfield's defenses and prohibiting Westfield from presenting evidence at trial.  (See JA 8 at Item No. 52, reflecting the  filing of Carpenter's Motion.)  Westfield responded on October 29, 2013 (JA 9 at Item 58) and Carpenter then served a Reply on November 5, 2013 (JA 9 at Item No. 60.)  The Court did not immediately rule upon that Motion and discovery continued.

At the time Westfield served its original responses to Carpenter's discovery requests, Westfield also served an Objection And Privilege Log to identify those documents being withheld under a claim of privilege.  Due to the voluminous nature of the claim file materials, Westfield's counsel bates stamped the materials for identification and then divided them into a number of notebooks.  While all of the privileged materials were removed from the claim file being produced, an inadvertent error resulted in only those privileged materials contained in one of the notebooks being identified on the Privilege Log which began with an identification of the

13

document beginning at pg. 526, instead of page 3, which was the first document actually withheld. Once this error was discovered, Westfield provided a Supplemental Objection And Privilege Log, along with its First and Second Supplemental Answers to Carpenter's discovery requests. (See JA 183-185, the Log attached to Westfield's First and Second Supplemental Responses JA 160-182.) The validity of Westfield's claims of privilege with respect to those documents would become the focus of multiple discovery disputes as the litigation progressed and is also one of the central issues raised by Carpenter in this Appeal.

In conjunction with a request to have the Scheduling Order vacated, Carpenter served its 2d (Second) Motion To Compel Full, Complete, and Meaningful Discovery Responses By Westfield Insurance Company, Motion To Compel Westfield To Designate Representative(s) To Testify, And Produce Responsive Documents In Response To Carpenter's Rule 30(b)(6) Notice Of Deposition And Rule 34 Duces Tecum, And In The Alternative 2d (Second) Motion To Strike, And In Limine To Exclude Evidence, and Carpenter's Motion To Disqualify Westfield's Counsel on January 23, 2014. (See generally, JA 138-159.) The specific documents at issue with respect to Carpenter's Second Motion were identified as bates pgs. 3-27, 28, 1016, 1018, 1056-1080 and 1112 - 1113. (See JA 140-141.) As could be readily ascertained from the Supplemental Objection And Privilege Log, all of these documents directly

14

concern communications between Westfield employee Judy McConkey (now Judy Ellis) and Westfield's counsel regarding the coverage issues which were at the heart of this litigation.  (See JA 183-185.)  For example, the April 30, 2013 letter from attorney Brent Kesner to Ms. McConkey is specifically described as "regarding opinion on duties to defend and indemnify with recommendations for further action." JA 183.  In order to support its claim of privilege, Westfield identified each document by date, author, recipient (if applicable) and by providing a description sufficient to allow either Carpenter or the Court to determine the general nature of the document and the application of the asserted privilege.

On August 21, 2014, Magistrate Judge Vandervort entered a lengthy Memorandum Opinion And Order denying Carpenter's 2d (Second) Motion To Compel except to the extent that it requested that the court conduct an *in camera* review of the subject documents. JA 1694-1709.  In particular, the Magistrate Judge determined that Westfield's claims of privilege with respect to the documents at issue were proper and had not been waived (See JA 1705-1707.)  The Magistrate Judge further denied Carpenter's request that Westfield's counsel be disqualified, noting:

> Having determined that Westfield properly withheld Mr. Kesner's April 30, 2013, letter and the other documents identified in Westfield's Supplemental Objection and Privilege Log, the Court finds nothing even remotely indicating any conflict of interest or ethical breach connoting

15

an appearance of impropriety which would require Mr. Kesner's disqualification.

JA 1709.

While the discovery disputes discussed above were proceeding, the parties also submitted dispositive motions with respect to the coverage issues and Carpenter's Counterclaim. In that regard, Westfield filed its Motion For Summary Judgment On Insurance Coverage Issues JA 217-218 and Carpenter filed its Motion For Partial Or Summary Judgment On Insurance Coverage, And For Partial Summary Judgment On Liability And Damages JA 442-459 on January 30, 2014. Through an Order entered on July 2, 2014 (See JA 31 at Item No.268), the Court invited the parties to submit any supplemental materials in support of their dispositive motions by August 5, 2014. Pursuant to that Order, Carpenter submitted its Supplemental Motion For Partial Or Summary Judgment On Insurance Coverage, And For Partial Summary Judgment On Liability And Damages, And, In The Alternative, Motion To Realign The Parties (JA 1323-1344) and Westfield submitted its Supplemental Memorandum In Support Of Westfield's Motion For Summary Judgment On Insurance Coverage Issues And In Opposition To Carpenter Reclamation Inc.'s Request For Partial Summary Judgment On Liability And Damages (JA 1142-1160) on August 5, 2014. After the parties submitted their respective Responses and Replies, the District Court entered its

16

September 17, 2014 Memorandum Opinion And Order granting Westfield's request for summary judgment and denying Carpenter's Motion. JA 2146-2178. The District Court found that coverage under the Westfield Policy was not triggered because the BOE had not set forth a claim for property damage arising out of an accident or occurrence and that the underlying action was merely a contract dispute for which no coverage was provided. The District Court explained:

> The Court finds that the allegations in the BOE's Petition(s) against Carpenter were not reasonably susceptible to an interpretation that the contract dispute - concerning who had to do what, when, and to what degree - could be covered under the terms of the respective CGL Policy. More reasonably, the allegations were susceptible to the interpretation that this was nothing more than a contract dispute between parties that did not involve property damage or personal injury arising out of an occurrence or accident, as defined by the policy.

JA 2177. Carpenter then filed this Appeal.

## SUMMARY OF ARGUMENT

The District Court correctly found that coverage under the Westfield commercial general liability insurance policy does not apply to the claims asserted against Carpenter Reclamation, Inc. by the Greenbrier County Board Of Education in Greenbrier County Civil Action No. 13-C-15. Specifically, the Board's claims were for declaratory judgment and breach of contract and were not covered because the Board did not allege an "occurrence" or "accident" causing "property damage".

17

While Carpenter has asserted that the Board's claims for "overblasting" constitute claims for property damage (arguing that the claim involves the destruction of bedrock during the blasting process), the evidence establishes that the Board was seeking the Court's assistance in resolving a contract dispute over who was responsible under the subject contracts for the installation of lean concrete fill as required under the project specifications. The District Court correctly found that the Board's claims related solely to the dispute over who was responsible for installing lean concrete in certain areas of the project and that such a contract dispute does not involve an accident, an occurrence, or property damage and, therefore, is not covered under the terms of Westfield's Policy.

Carpenter's reliance upon the West Virginia State Supreme Court of Appeals' decision in *Cherrington v. Erie Ins. Prop. & Cas. Co.*, 745 S.E. 2d 508 (W. Va. 2013), is also misplaced because the Board's Petition did not involve any unanticipated or unexpected damage to the Board's property. Instead, the report of the Board's expert, Tammy St. Clair, indicates the Board's acknowledgment that overblasting or over excavation was expected and anticipated. Furthermore, the testimony indicated that the depth of drilling controls the depth of the excavation and that Carpenter Reclamation Inc. did the drilling. Therefore, any allegation that Carpenter drilled too deep necessarily involves the work of Carpenter which

18

eliminates the possibility of coverage under the subcontractor exception relied upon by Carpenter.

Carpenter's arguments with respect to Westfield's claims of privilege as to certain communications between Westfield and its counsel are unsupported. Westfield properly identified the documents for which it was asserting a claim of privilege and never disclosed them. Likewise, Westfield never asserted advice of counsel as a defense or otherwise waived the attorney client privilege. Moreover, the advice given by Westfield's counsel is irrelevant to the coverage issues, which are controlled by the underlying facts of the case and the terms of the Westfield Policy. Coverage either existed or it did not and the advice given by counsel could not change that fact.

In this case, the evidence clearly established that Westfield denied coverage for the claims against Carpenter based upon the fact that the Board's claims concerned a request for declaratory relief and a contract dispute related to Carpenter's work under its contract with the Board, rather than an accident or occurrence causing property damage. Westfield certainly did not "know" that the Board's claims were covered but denied coverage anyway. Instead, Westfield reasonably belied and continues to believe that the Board's claims are not covered. In fact, the *Cherrington* decision upon which Carpenter mistakenly relies was not even issued until after Westfield had

19

denied coverage in this case and filed the present declaratory action. Therefore, Carpenter had no evidence to support its "bad faith" and Unfair Trade Practices Act claims or its claims for punitive damages and the District Court properly granted summary judgment in Westfield's favor with respect to those claims.

## ARGUMENT

### I.    STANDARD OF REVIEW

The Court reviews a district court's grant of summary judgment *de novo*, applying the same standard as the district court. *Sylvia Dev. Corp. v. Calvert County Md.*, 48 F. 3d 810, 817 (4th Cir. 1995). "Summary judgment is justified if, from the totality of the evidence presented, including pleadings, depositions, answers to interrogatories and affidavits, the court is satisfied that there is no genuine issue for trial and the moving party is entitled to judgment as a matter of law. *Id.*

Summary judgment is mandated if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The movant's burden "may be discharged by 'showing' - - that is, pointing out to the district court - - that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S.  317, 325 (1986).  To defeat summary judgment, nonmovants must present "concrete evidence from which a reasonable juror

could return a verdict in [their] favor[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Fed. R. Civ. P. 56(c), (d)*.

## II.    DISCUSSION

### A.    The District Court properly found that Westfield had no duty to defend or indemnify Carpenter under the subject Commercial General Liability Policy.

It is undisputed that West Virginia law governs the subject claims.  Under West Virginia  law, liability insurance creates two (2) duties for the insurer: the duty to defend and the duty to provide coverage.  *Aetna Cas. & Sur. Co. v. Pitrolo*, 176 W. Va. 190, 194, 342 S.E.2d 156 (1986).  The insurer must defend its insured if the allegations and the facts behind them "are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy."  *Id*.; Syl. Pt. 6, *Farmers & Mechs. Mut. Ins. Co. v. Cook*, 210 W. Va. 394, 557 S.E.2d 801 (2001); *Horace Mann Ins. Co. v. Leeber*, 180 W. Va. 375, 378, 376 S.E.2d 581 (1988) (citing *Pitrolo*, 176 W. Va. 190).  The insurer must defend all the claims if its policy could apply to any of them, but it "need not defend ... if the alleged conduct is entirely foreign to the risk insured against."  *Leeber*, 180 W. Va. at 378.

Clear insurance policy provisions are to be applied.  *Cook*, 210 W. Va. at Syl. Pt. 5 (citing Syl. Pt. 1, *Soliva v. Shand, Morahan & Co.*, 176 W. Va. 430, 345 S.E.2d 33 (1986)); *Green v. Farm Bureau Mut. Auto Ins. Co.*, 139 W. Va. 475, 80 S.E.2d

424, 426 (1954). An insurer may validly limit coverage, and policy provisions that limit coverage are placed in a policy for that very reason. *Green*, 80 S.E.2d at 426. Insurance coverage is a matter of law if material facts are undisputed. Syl. Pt. 1, *Tennant v. Smallwood*, 211 W. Va. 703, 568 S.E.2d 10 (2002). The only facts material to insurance coverage in this case are the Policy's terms and the BOE's allegations in its Petition and Amended Petition in the underlying state action. *Leeber*, 376 S.E.2d at 584.

1.    *The BOE did not allege any "property damage" or "occurrence" which would trigger coverage under the Westfield Policy.*

The Westfield Policy at issue in this case provides general liability coverage whereby Westfield agreed to pay those sums which Carpenter becomes legally obligated to pay as damages because of "bodily injury" or "property damage" caused by an "occurrence," to which the Policy applies. JA 282. Here, it is undisputed that there is no allegation or claim for "bodily injury," as defined by the Policy. Nor did the BOE present a claim for "property damage," which is defined by the Policy as physical injury to tangible property or the loss of use of such property. JA 296-297. Instead, the BOE's Petition specifically indicates that it is a "Petition For Declaratory Relief And Award(s) And Judgment For Breach Of Contract." JA 219-225. The Petition makes no allegation of "negligence," "property damage" or "accident."

22

Instead, the Petition addresses Carpenter's "non-conforming work" and breach of contract. (See generally, JA 219-225.) In that regard, the only claims at issue were for the costs associated with replacing the non-conforming fill, modifying the plumbing, completing contractual testing, and replacing a defective liner. No building or other tangible property was alleged to have been damaged and the BOE did not seek to recover for the loss of use of any property. (See generally, JA 219-225.)

In addition to the failure to assert any claim for "property damage," the BOE also does not assert a claim for loss or damage arising from an "occurrence," defined by the Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (See JA 296.) In that regard, the term "accident" has been found to be unambiguous: its "common and everyday meaning ... is a chance event or event arising from unknown causes." *W. Va. Fire & Cas. Co. v. Stanley*, 216 W. Va. 40, 49, 602 S.E.2d 483 (2004). "'To be an accident, both the means and the result must be unforeseen, involuntary, unexpected, and unusual.'" *Id.* (citations omitted). Here, all of the BOE's allegations concern Carpenter's failure to follow the contract's plans and specifications, and the resulting costs to correct and complete the non-conforming work. No "accident" is alleged or at issue.

In *State Bancorp, Inc. v. U. S. Fid. & Guar. Ins. Co.*, 199 W.Va. 99, 483 S.E. 2d 228 (1997), the West Virginia State Supreme Court examined the "occurrence" language found in commercial general liability policies, such as the Westfield Policy at issue here, and noted:

> An "occurrence" is defined in the CGL policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The word "accident" is not defined in the policies. Ordinarily, "accident" is defined as "an event occurring by chance or arising from unknown causes[.]" *Webster's New Collegiate Dictionary* 7, (1981). As one court has explained,
>
>> an 'accident' generally means an unusual, unexpected and unforseen event. . . . An accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforseen happening occurs which produces the damage. . . . To be an accident, both the means and the result must be unforseen, involuntary, unexpected and unusual.

*State Bancorp, Inc.* at 105. The Court then discussed whether claims for breach of contract are covered under such policy language, and stated:

> As some courts have recognized, a breach of contract which causes "bodily injury" or "property damage" is not an event that occurs by chance or arises from unknown causes, and, therefore, is not an "occurrence" as that word is defined in Aetna's and USF&G's CGL policies.

*Id.* The Court then found that the breach of contract claims at issue in *State Bancorp, Inc.* were not covered and did not trigger a duty to defend because they were "entirely

24

foreign to the risk insured against." *Id.* at 106. (citing *Leeber*, 180 W.Va. at 378 ("a liability insurer need not defend a case against the insured if the alleged conduct is entirely foreign to the risk insured against.")) Here, the BOE's claims were expressly for "breach of contract" and there was no allegation of "negligence" on the part of Carpenter.

The nature of the BOE's claims against Carpenter were succinctly set forth in the Report of the BOE's retained expert, engineer Tammy St. Clair. Her December 2, 2013 Report states:

> While unauthorized excavation of some areas was anticipated and foreseeable in blasting operations, the specifications required unauthorized excavation in the building area to be filled with lean concrete. Instead, Carpenter filled unauthorized excavations with Class B fill (fill material with 1- foot minimum, 2 f-foot maximum, and 18-inch average particle size) to within 4 feet of the finished subgrade and Class A fill for the remaining 4 feet to the finished subgrade elevation. . . . By installing inappropriate fill material, Carpenter did not conform to the specifications (non-conforming work).

(See JA 439-440.) St. Clair further explained what had to be done to correct Carpenter's non-conforming work, as follows:

> As a result of the non-conforming work by Carpenter in the Early Site Package phase of construction, time delays and additional costs were incurred by others in the subsequent construction phase. In the building area, Swope removed all of the Class B fill and the Class A fill in excess of 31/2 feet that was installed by Carpenter in unauthorized excavation areas and replaced it with lean concrete to an elevation that corresponded with the bottom of the foundations. . . . Dougherty Company, Inc., the

25

plumbing sub-contractor, also experienced additional costs related to the unauthorized excavation. These costs were related to providing longer plumbing sleeves that pass under the foundation and excavating some of the lean concrete that was installed by Swope.

(See JA 441.) Put simply, Swope and the BOE were asserting that the contract required Carpenter to use lean concrete to fill in areas where it blasted or excavated below the elevation called for in the specifications. This position was based upon Section 3.10 of the Earth Moving specifications, which provided:

3.10    UNAUTHORIZED EXCAVATION

A.    Fill unauthorized excavation under foundations or wall footings by extending bottom elevation of concrete foundation or footing to excavation bottom, without altering top elevation. Lean concrete fill, with 28-day compressive strength of 1000 psi (17.2 Mpa), may be used when approved by Architect.

1.    Fill unauthorized excavations under other construction, pipe, or conduit as directed by Architect.

(See JA 1214.) While Carpenter has argued that Westfield cannot rely upon those contract specifications regarding unauthorized excavation and the need for lean concrete fill because the BOE's Petition only asserts that Carpenter blasted to a depth deeper than that required by the project specifications, the BOE attached a copy of the contract to the Petition as an exhibit and incorporated the contractual requirements into the allegations of its Petition. (See JA 467, the list of attached Exhibits included with the BOE's Petition.) That fact is important because in *Aluise v. Nationwide Mut.*

26

*Fire Ins. Co.* 218 W.Va. 498, 625 S.E. 2d 260 (2005), the West Virginia State Supreme Court recognized that "Rule 10(c) [of the West Virginia Rules of Civil Procedure] makes a copy of any written instrument that is an exhibit to a pleading a part thereof for all purposes." Thus, the contract specifications regarding the filling of unauthorized excavation with lean concrete are part of Petition and the Court can consider the fact that they expressly contemplate and anticipate "unauthorized excavation" below the specified elevation when deciding whether the BOE's Petition sets forth a covered claim arising from an "occurrence" or accident.

In his deposition, Carpenter's retained expert architect David Marshall testified as follows:

> Q.    Okay.   Were there also allegations that the fill that Carpenter had used to fill back in after its excavation was not the fill that was called for in the specifications?
>
> ***
>
> A.    There were allegations of wrongful fill.
>
> Q.    Okay. When you say "wrongful fill," what do you mean by wrongful fill?
>
> A.    Well, that's - - that's there were allegations that the fill used by Carpenter was not according to the specifications.
>
> Q.    In particular, was that that instead of using Class A fill in a certain part of the building pad, they used Class B?

> A. Not specifically that I saw. What - - that - - what I saw was that - - or what I took from the information I gathered was that Class B fill should have been CLSM at the level that they were speaking about to make up for the alleged overblasting, and that wasn't in the specifications.

(See JA 1227-1228.)   While Swope and the BOE were asserting that it was Carpenter's duty under Specification 3.10 to fill in areas of unauthorized excavation with lean concrete (See St. Clair's opinions discussed above), Carpenter and its experts asserted that it was Swope's duty to install the lean concrete and denied that specification 3.10 applied to Carpenter.  For example, Carpenter's construction expert Greg Boso was asked about St. Clair's opinions regarding Carpenter's failure to use lean concrete and testified as follows:

> Q. And is it her opinion, as far as you know from what you've read and heard, that Carpenter should have used lean concrete?
>
> A. That is her opinion.
>
> Q. And you disagree with that opinion?
>
> A. Wholeheartedly.
>
> Q. You believe that Carpenter used the correct fill of either Class B fill or Class A fill, depending upon the elevation?
>
> A. I do.  Those are clearly stipulated with their contract documents.

(See JA 1249.) Mr. Boso also explained that when Swope began installing the footers, it had to dig to a depth deeper than the 3 and ½ foot it had been expecting to reach a solid surface upon which it could build.  He was asked:

> Q.  Was it Swope's position, then, that Carpenter should have either taken this down to the exact elevation on bedrock or filled back in with cement to reach that elevation?
>
> A.  The representations that Swope makes is based on their contract documents, more specifically with regard to the over-excavation indicated in Paragraph 3.7.  In their particular documents, it's indicated by captioning in that particular title that this was work provided by others, and the same clause occurs within their contract documents.  So that had an understanding that below the subgrade elevation, the rock would be removed down three and a half feet or any other material would be removed and replaced three and a half feet below the building slab.
>
> Q.  So, essentially, Swope's document and Swope's position are that, as far as Swope was concerned, they were going to be getting a building pad that had three and an half feet of Class A fill and then solid beneath it?
>
> A.  I believe that's a reasonable representation.
>
> ***
>
> Q.  Whatever kind of soil they found as in the various places they were digging, they just didn't find that solid surface three and a half foot down that they expected?
>
> A.  That's correct.

29

Q.    Instead, they found whatever was there, whether it was in situ soil, whether it was fill that Carpenter had put in place, whether it was rock, depending upon what part of the school they were at.  Correct?

A.    Yes.

***

Q.    Did they want the extra costs of putting in the CLSM to get to the level they thought they were going to be getting?

A.    Swope's contract documents compelled Swope to extend their footings to the depth as required to undisturbed bedrock, regardless of whether it was at the three and a half foot level or to any other level.  I think it's reasonable to conclude that Swope was contending that they were having to expend additional dollars for unexpected work based on the conditions that they encountered.

(See JA 1254-1257.)    In light of this evidence, it is clear that the BOE's claims

centered upon the dispute over who was responsible for installing lean concrete

beneath the footers of the school building so that they could rest on bedrock.  For

example, in Paragraph 19 of its Petition, the BOE asserts:

Petitioner is in a position where there is clearly a justiciable controversy and dispute which requires it to seek declaration of this Court as to: (a) the claims of Swope, Dougherty, and Carpenter which would permit Petitioner to accept or reject the claims of Swope and Dougherty for payment for alleged non-conforming work of Carpenter; (b) would permit Petitioner to apply the Carpenter contract retainage to, in part, pay or reimburse for amounts due to others for remediation of the Carpenter non-conforming work; and (c) would permit Petitioner allowance/compensation as against Carpenter and Western Surety for

30

> any amounts Petitioner is required to pay Swope and/or Dougherty for the non-conforming work of Carpenter.

(See JA 1166.)  While Carpenter clearly contested the position of the BOE and Swope, the nature of the BOE's allegations is clear.  Rather than seeking to recover for damage to its property, the BOE was seeking the Court's assistance in resolving a contract dispute over who was responsible under the contracts at issue for the installation of lean concrete fill as required under the project specifications. Therefore, coverage under the Westfield Policy was never triggered.

Carpenter attempts to get around the "property damage" requirement by asserting that the BOE's allegations of "overblasting" imply that the bedrock in question was somehow "damaged."  Specifically, Carpenter asserts that it was only contracted to excavate the BOE's property down to a specified elevation and that any excavation below that level would constitute "property damage."  In effect, Carpenter is suggesting that the property be imagined as a layer cake, arguing that Carpenter's contract only permitted it to work on the top layer.  Any excavation into a lower layer would presumably be beyond the scope of the work and, therefore, would represent "damage" to the BOE's property.  This argument simply ignores how blasting is actually used in the construction industry.  For example, Carpenter's expert Greg Boso testified:

31

Q.    But there's still probably going to be some variability, even from hole to hole - - in other words drilling site to drilling site - - between how the rock reacts to the explosion. Right?

\*\*\*

A.    You're going to get some variation hole to hole.

Q.    And in the industry, how do you account for that variation? In other words, how do you fix it so that you wind up with a single plane to build on where you want to have it?

A.    That plane is the responsibility - - methodology, the sequence, the techniques are the requirements of the contractor to design their - - or to accomplish their work in a manner that achieves what is required by the contract documents.

Q.    Well, one way is to be able to perfectly blast it so that you get to exactly the precise plane you want right?

A.    True.

Q.    Very difficult to do though isn't it?

A.    It is.

Q.    Another way is to blast less than you need, and then chip or hammer your way down to the plane you want it to be on. Correct?

A.    That's correct.

Q.    And a final way is to blast below that plane, and then fill your way back up.  Correct?

32

> A.    That could be a methodology utilized by the contractor.
>
> Q.    So all three of those are potentially available to a contractor who is doing this type of job.  Right?
>
> A.    Potentially.
>
> Q.    Those are all acceptable within the industry, are they not?
>
> A.    To my knowledge, yes.

(See JA 1259-1261.)  He then admitted that in the blasting industry, it is anticipated that a contractor may blast above the required elevation or below it and then fill back in to reach the desired elevation. (See JA 1263.)  That fact is important because the Westfield Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" JA 296, and the term "accident" has been normally defined as "a chance event or event arising from unknown causes." *Stanley*, 216 W. Va. at 49.  Since the breaking up of rock is the anticipated and expected as part of blasting operations, it is simply not an accident and, therefore, does not qualify as an "occurrence" triggering coverage. Nor does it provide any basis for Carpenter's request that the "occurrence" issue be certified to the West Virginia State Supreme Court of Appeals.

Any doubt regarding whether excavation below the required sub-grade was anticipated can be resolved by examining Section 3.10 of the earth moving

specifications quoted above, which specifically provide for filling "Unauthorized Excavation" below the sub-grade elevation with lean concrete. JA 1214. Carpenter's expert David Marshall was asked about this and testified:

> Q. The contract - - the specifications contemplate that unauthorized excavation could happen, do they not?
>
> A. The area 3.10 anticipates if there is excavation below a certain level that - - that fill would have to be put back in.

 (See JA 1231.)  Similarly, Roger Carpenter, the supervisor on site for Carpenter during the job testified:

> Q. But it's your understanding then that the only time you were to use lean concrete is if you went below the elevation that was called for.
>
> A. If - - if we have had walls and footers on our job, then we'd have to dig it out and bring it back up with lean concrete, but we didn't have any on our contract that I'm aware of.

(See JA 1282.)  Since "overblasting" or unauthorized excavation below the final desired elevation was expressly contemplated under the written contract specifications and the method of addressing such excavation was spelled out, allegations that Carpenter "overblasted" simply do not constitute an alleged "occurrence."  Such unauthorized excavation was an anticipated part of the blasting process and was expected.  Therefore, it cannot be considered to have been an accident and Westfield

could have no duty to defend or indemnify Carpenter against the BOE's underlying declaratory and breach of contract action.

In its quest to find any support for its theory that damage to the bedrock beneath the blasting area could constitute an "occurrence" for purposes of coverage under a commercial general liability policy, Carpenter also directs the Court to *Danric Construction v. Canadian Surety Co.*, 2002 BCSC 1663 (Dec. 2, 2012), a decision from Canada. While *Danric* is certainly not controlling precedent in the United States, it involved an allegation of "irreversible physical damage to the land," which is certainly not present in the BOE's Petition. While Carpenter's theory regarding damage to the bedrock is a novel example of creative lawyering, it provides no grounds to conclude that an "occurrence" or accident was alleged by the BOE in the underlying action and certainly cannot create coverage where coverage otherwise does not exist. Here, damage to the rock below the final elevation was expressly contemplated in the written contract specifications and was clearly not unforeseen, unexpected or unanticipated. Therefore, no "accident" was alleged and the District Court correctly found that Westfield had no duty to defend or indemnify Carpenter.

Like the Commercial General Liability Coverage, the Commercial Umbrella Coverage provisions of Westfield's Policy also require that any claim for "bodily injury" or "property damage" be caused by an "occurrence" for coverage to apply.

35

(See JA 328.)  Because there is no claim by the BOE for either "bodily injury" or

"property damage" as defined by the Commercial Umbrella provisions of the Policy

(See the Umbrella Policy definitions of those terms at JA 343), there is no coverage

for the same reasons as discussed above.

2.    *Coverage for the BOE's claims is also expressly excluded under the terms of the Westfield Policy.*

Even assuming, *arguendo*, that coverage under the Policy had been "triggered"

by the claims of the BOE, the Policy contains relevant exclusions which are applicable

and exclude coverage for the BOE's claims.  The first of these is the "Contractual

Liability" exclusion, which precludes coverage for any liability that Carpenter might

incur for breach of its contract with the BOE. (See JA 283 and JA 329.)   Both the

Commercial General Liability and the Umbrella Coverage provisions of the Policy

exclude coverage for:

> "Bodily injury" or "property damage" for which the insured is obligated
> to pay damages by reason of the assumption of liability in a contract or
> agreement.

(See JA 283 and JA 329.)  Here, all of the BOE's claims arise from Carpenter's

alleged breach of contract and Carpenter's failure to conform to the contract's

specifications.

Next, the Policy excludes coverage for "property damage" to that particular part of real property on which Carpenter or its contractors or subcontractors working directly or indirectly on Carpenter's behalf are performing operations, if the "property damage" arises out of those operations. (See JA 285, at Exclusion J.(5)) Again, while no "property damage" as defined by the Policy is alleged by the BOE, all of Carpenter's work was on the BOE's real property. Any damage could only be to the BOE's real property, arising from Carpenter's work, or the work of its subcontractors. Therefore, the Policy provides no coverage for the BOE's claims.

The Westfield Policy also excludes coverage for "property damage" to that particular part of any property that must be restored, repaired or replaced because the work of Carpenter was incorrectly performed on it. (See JA 285 at Exclusion J.(6)). Here, all of the BOE's claims arise from the work needed to replace non-conforming fill and a defective liner installed by Carpenter. In the same fashion, the Westfield Policy also excludes coverage for damage to Carpenter's product or work. (See JA 286 at Exclusion k. and JA 313 at Exclusion l.) Since all of the BOE's claims concern the replacement of the non-conforming fill and defective liner installed by Carpenter, there is simply no coverage under the plain language of the Policy.

Finally, the Westfield Policy excludes coverage for "impaired property," defined as tangible property that cannot be used or is less useful because it

37

incorporates the "work" or product of Carpenter, where the property can be restored to use by the repair, replacement or adjustment of the insured's defective work or product, or by the insured fulfilling the terms of its contract or agreement.  (See JA 286 at Exclusion m.).  Any claim of the BOE resulting from the failure of Carpenter to excavate the site to the appropriate level, installation of incorrect fill, and/or based upon Carpenter's installation of a defective liner, all of which was be remediated by the repair/adjustment of the elevation level with correct fill, and the replacement of the defective liner, is excluded by the Policy.  Since those are precisely the claims asserted by the BOE in this case, there is simply no coverage for the BOE's claims under the Policy and Westfield has no duty to defend or indemnify Carpenter with respect to the BOE's claims.

3.    *The sub-contractor exception relied upon by Carpenter does not apply because there was no property damage alleged and Carpenter did the drilling which controlled the depth to which the blasting was done.*

In its Brief, Carpenter makes much of the fact that the blasting work in question was completed by a subcontractor and suggests that this means that the exclusion for damage to Carpenter's product or work contained within Westfield's Policy does not apply.  The exclusion at issue provides, in relevant part, that the Policy excludes coverage for:

### I.    Damage To Your Work

> "Property damage" to "your work" arising out of it and included in the "products-completed operations hazard".
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.
>
> This exclusion only applies to that particular part of "your work" out of which the damage arises.

(See JA 313.)  Carpenter's reliance upon the so-called "subcontractor exception" is apparently based upon the West Virginia State Supreme Court's finding in *Cherrington*, 231 W.Va. 470, where the Court stated:

> When read together the 'your work' exclusion and the 'subcontractor exception' eliminate coverage for property damage caused by an insured contractor's work, but restore coverage for property damage caused by a subcontractor's work.

*Id*. at 486 (citations omitted.)  While the Court in *Cherrington* did recognize that defective workmanship can constitute a covered "occurrence" under a commercial general liability policy, it also found that any alleged defective workmanship must still have caused either bodily injury or property damage before coverage can apply.  (See, *Cherrington*, 231 W. Va. at Syl. Pt. 6.)  As discussed above, this case, unlike *Cherrington*, does not involve any allegation by the BOE of property damage to trigger coverage.  (In *Cherrington* the claimant identified multiple areas of her

39

property that had been damaged by the insured's poor workmanship, such as a roof leaking that had damaged the ceiling,  and settlement that had produced a sagging support beam and numerous cracks in the walls.   (*Cherrington*, 745 S.E.2d at 522.) The dispute in this case centered upon who was responsible under the contracts for the cost of installing lean concrete fill beneath the school building.  Unlike *Cherrington*, this case did not involve any unanticipated or unexpected damage to the BOE's property.

Carpenter has suggested that the "property damage" at issue here is the damage to the bedrock below the elevation to which Carpenter was supposed to excavate. While Carpenter apparently asserts that such damage was caused by the actions of a subcontractor, its own expert, Mr. Boso, testified as follows:

> Q.    Okay, When you are going down, as opposed to shearing off a piece.  In other words, when you're basically, blasting a hole down into the ground, do you control that by just the depth of the drilling, in other words, how far down you drill?
>
> *      *      *
> A.    The drilling is used to - - the depth of the drilling is used to control how deep any series of blasts are accomplished.

(See JA 1267.)  This fact is important because Roger Carpenter, the supervisor for Carpenter on the job, testified that the drilling at the project was performed by Carpenter, not the blasting subcontractor.  He was asked:

Q.     So Carpenter did the drilling.

A.     Right.

(See JA 1276.)  Because the depth of drilling controls the depth of the excavation and Carpenter did the drilling, any allegation that Carpenter drilled too deep necessarily involves the work of Carpenter, not a subcontractor.  Therefore, Carpenter's reliance upon the subcontractor exception is misplaced.

## B.     Carpenter mischaracterizes the testimony of Westfield employee Judy (McConkey) Ellis.

In its Brief, Carpenter suggests that Westfield claims representative Judy (McConkey) Ellis has admitted that Carpenter's coverage position is correct.  In fact, Carpenter has mischaracterized her testimony and seeks to take her testimony out of context in order to somehow transform the BOE's breach of contract allegations into a negligence claim.

As discussed above, Carpenter takes the position in this case that any damage to the rock or soil below the specified grade of 2,188.83 feet constituted "property damage" to the BOE's property caused by an occurrence.  During Ms. (McConkey) Ellis' deposition, Carpenter's counsel attempted to obtain an admission from her regarding that issue by repeatedly asking whether blasting below the specified elevation of 2,188.83 feet would constitute "property damage" for purposes of

coverage under the Westfield Policy. Ms. (McConkey) Ellis repeatedly recognized that, as a hypothetical matter, it could if certain allegations were made, but insisted that it did not in this particular case because those allegations were not presented by the BOE. For example, Ms. Ellis was asked:

> Q.    So, that's not Carpenter's work or its product below 2,188.83, that's the Board's, isn't it?
>
> A.    Yes.
>
> Q.    And the next sentence indicates that the exclusion related to work is inapplicable if the damage work or the work out of which the damage arises was performed on Carpenter's behalf by a subcontractor. In here you admitted that Carpenter used a subcontractor to perform the blasting. Is that exception applicable in that paragraph?
>
> A.    Again, it calls for a legal conclusion, but yes.
>
> Q.    Does that restore coverage?
>
> A.    It can.
>
> Q.    Did it?
>
>                                        ***
>
> The Witness:      No.
>
> Q.    Why?
>
> A.    Because there was still no occurrence that would trigger the insuring agreement.

42

(See JA 1527.)  Similarly, she was asked:

> Q.  What makes you say that that is not claimed, and what's the basis for your statement that that it's - - how it has to be claimed?
>
> A.  There was no allegation seeking a claim for property damage by the Board of Education.

(See JA 993.)  In another example, when asked about Carpenter's theory that damage to the bedrock beneath the blasting constituted an occurrence or "property damage," Ms. Ellis testified:

> Q.  I'm just asking you, and I'm trying to make sure, in your investigation that led up to your determination of insurance coverage, did you take into consideration alleged blasting by Carpenter beyond the specified grades, causing physical injury to the Board of Education's property below elevation 2,188.83 feet in elevation?
>
> A.  I don't believe so.  Again, there was no claim made for property damage to the board of Education.  I don't know that I had any reason to consider the alleged harm.

(See JA 1526.)  Far from admitting that blasting deeper than required by the project specifications triggered coverage under Westfield's Policy, Ms. Ellis actually reiterated that the BOE alleged no occurrence or property damage in its Petition to trigger coverage. (See JA 993 and 1526.)

Because the BOE did not assert a claim to recover for any damage to the underlying rock, there was simply no reason for Westfield or Ms. (McConkey) Ellis

43

to consider whether, under some novel legal theory, such damage could conceptually fall within coverage. Such a claim was not presented by the BOE's Petition. Instead, as discussed above, the BOE was seeking a declaratory judgment with respect to who was responsible under the contracts at issue for installing the lean concrete fill under the foundation. Such claims are simply not covered by the Westfield Policy with Carpenter.

**C.    Carpenter's arguments regarding discovery issues and alleged misconduct by Westfield and its counsel are irrelevant to the coverage issues presented in this appeal.**

In its Brief, Carpenter devotes considerable attention to its suggestion that Westfield has somehow acted improperly and interfered with its discovery efforts by refusing to allow it to have access to various communications between Westfield and its counsel. In particular, it suggests that Westfield's claims of privilege with respect to such communications are invalid and designed to "wreck" the discovery process and interfere with "truth seeking." In fact, Westfield's communications with its counsel regarding the coverage issues are privileged and are not subject to discovery under any legitimate theory. Moreover, the contents of such communications are completely irrelevant to the question of whether or not coverage exists.

1.    *Westfield has not asserted advice of counsel as a defense or otherwise waived its claims of privilege with respect to its communications with counsel regarding the coverage issues.*

In his August 21, 2014 *Memorandum Opinion And Order* Magistrate Judge Vandervort correctly recognized that in this diversity case, the Court applies state law to attorney-client privilege issues and federal law to work product issues. *Nicholas v. Bituminous Cas. Corp.*, 235 F.R.D. 325, 329 n. 2 (N.D.W. Va. 2006) (citing *Hickman v. Taylor*, 329 U.S. 495 (1947), and others). JA 1703. While the work product doctrine may also apply to many of the documents at issue, the documents at issue here represent direct communications between Westfield and its counsel. Carpenter's assertion that such materials are relevant and subject to discovery in this case is simply incorrect.

West Virginia's State Supreme Court dealt with the question of exactly what information must be provided in order to properly support a claim of privilege as to a particular document which has been requested in discovery in the case of *State ex rel Shroades v. Henry,* 187 W.Va. 723, 421 S.E.2d 264 (W.Va. 1992). The Court stated:

> [T]he party claiming the document is privileged should identify the document by name, date, custodian, source and reason for creation.

45

*Id.* at 729, 270. Such an identification allows the opposing party sufficient information to challenge an improper claim of privilege and further allows the Court to avoid an unnecessary *in camera* review of those documents which are clearly privileged. As discussed above, that is exactly the type of identification Westfield provided in this case. (See JA 183-185, the Privilege Log attached to Westfield's First and Second Supplemental Responses JA 160-182.)

It has long been recognized that the purpose of the attorney-client privilege is "to encourage full and frank communications between attorneys and their clients and, thereby, promote broader public interest in the observance of law and administration of justice." *Upjohn Co. v. U. S.*, 449 U.S. 383, 388 (1981). Thus, there can be little doubt that direct communications between the Westfield and its counsel would ordinarily fall under the protection of this privilege. Similarly, in *State ex rel. Allstate Ins. Co. v. Gaughan,* 203 W.Va. 358, 508 S.E. 2d 75 (1998), West Virginia's State Supreme Court noted:

> The attorney-client privilege belongs to the client. "'A client ... cannot be compelled, and a legal adviser ... will not be allowed without the express consent of his client, to disclose oral or documentary communications passing between them in professional confidence.'" Franklin D. Cleckley, *A Modest Proposal: A Psychotherapist-Patient Privilege for West Virginia*, 93 W. Va. L. Rev. 1, 12 n. 39 (1990).

46

*Gaughan*, 203 W. Va. at FN 21. In *State ex. rel. Allstate Ins. Co. v. Madden*, 215 W.Va. 705, 601 S.E. 2d 25 (2004), West Virginia's State Supreme Court explained the protections afforded to attorney-client communications as follows:

> The attorney-client privilege was developed as a means of protecting the confidential relationship shared between a client and his/her counsel. "Originating at common law, the attorney-client privilege 'has as its principal object the promotion of full and frank discourse between attorney and client so as to insure sound legal advice or advocacy.' " ...To shield evidence from disclosure based upon this privilege, certain enumerated criteria must be satisfied.

> In order to assert an attorney-client privilege, three main elements must be present: (1) both parties must contemplate that the attorney-client relationship does or will exist; (2) the advice must be sought by the client from that attorney in his capacity as a legal adviser; (3) the communication between the attorney and client must be identified to be confidential."

*Id*. at 713-714 (citations omitted). Here, it is undisputed that there was an attorney-client relationship between Westfield and attorney Kesner. Likewise, it is obvious that the subject communications between Westfield and its counsel were made in connection with the underlying litigation and the coverage issues being addressed here. While the application of the privilege is obvious, an *in camera* review of the documents revealed to the Magistrate Judge that they were specifically identified as attorney-client communications. JA 1708. Accordingly, the materials at issue are clearly protected by the attorney-client privilege.

47

A party "may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party[.]" pursuant to *Fed. R. Civ. P. 26(b)(1)*. In West Virginia, relevance is "a threshold discovery issue[,]" and "'only after information is determined to be relevant'" does the Court consider whether attorney-client privilege bars its discovery. *Nicholas*, 235 F.R.D. at 329 (citing, quoting *State ex rel. Erie Ins. Prop. & Cas. Co. v. Mazzone*, 218 W. Va. 593, 625 S.E.2d 355, 357-58 (2005)). If a party alleges advice of counsel, for example, "[r]elevant evidence regarding the advice of counsel may be admissible ... as part of the calculus of evidence that the fact finder considers ...." Syl. Pt. 2, *Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC*, 209 W. Va. 318, 547 S.E.2d 256 (2001). Here, the Magistrate Judge correctly recognized that Westfield has never asserted advice of counsel as a defense and has in no way placed the advice given by its attorneys at issue. JA 1706-1707.

In its Brief, Carpenter suggests that Westfield has somehow waived the attorney-client privilege by simply filing this declaratory action and/or denying coverage. If that were true, no insurer could file a declaratory judgment action after receiving advice from counsel without automatically waving the privilege with respect to that advice. While Carpenter directs the Court to various federal decisions from other jurisdictions to support this argument, none of them apply here because the

48

Court is to apply West Virginia state law to attorney-client privilege issues. *Nicholas v. Bituminous Cas. Corp.*, supra. Here, Magistrate Judge Vandervort properly rejected Carpenter's arguments under West Virginia law.

In his August 21, 2014 *Memorandum Opinion And Order* Magistrate Judge Vandervort correctly applied the West Virginia State Supreme Court's decision in *State ex. rel. Montpelier US Ins. Co. v. Bloom*, 757 S.E. 2d 788 (W.Va. 2014), where the Court expressly rejected Carpenter's arguments. The *Montpelier* Court noted:

> It has been recognized "that an insurance company's retention of legal counsel to interpret the policy, investigate the details surrounding the damage, and to determine whether the insurance company is bound for all or some of the damage, is a classic example of a client seeking legal advice from an attorney." . . . In this situation, a coverage opinion letter written by outside counsel to the insurer containing legal advice "is protected by the attorney-client privilege because it involved confidential communications."

*Id.* at 794. It also pointed out:

> [A]n insurance company should be free to seek legal advice in cases where coverage is unclear without fearing that the communications necessary to obtain that advice will later become available to an insured who is dissatisfied with a decision to deny coverage. A contrary rule would have a chilling effect on an insurance company's decision to seek legal advice regarding close coverage questions, and would deserve the primary purpose of the attorney-client privilege-to facilitate the uninhibited flow of information between a lawyer and client so as to lead to an accurate ascertainment and enforcement of rights.

*Id.* at 795.   In this case, the redacted documents at issue directly concern communications between Westfield employee Judy (McConkey) Ellis and Westfield's counsel regarding the   coverage issues which are at the heart of this litigation. Carpenter provides no grounds for  subjecting such communications to discovery by opposing parties.  The mere fact that Westfield eventually filed a declaratory action is irrelevant to the issue of whether the privilege applies.

As noted above, Westfield also asserted that the work product doctrine applies to the documents at issue inasmuch as they were generated in anticipation of the underlying litigation and/or this declaratory action.  In that regard, work product protection applies to otherwise discoverable materials prepared in anticipation of litigation or for trial.  Fact work product may be subject to discovery if the party seeking discovery cannot "'without undue hardship ... obtain the substantial equivalent of the materials by other means [, ... but] the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney... of a party concerning the litigation." *Fed. R. Civ. P. 26(b)(3)*; *In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994) [opinion work product "even more scrupulously protected" than fact work product (citations omitted)].  Obviously, coverage opinion letters such as the communications at issue here are exactly the type of materials protected under this rule.

Here, the Magistrate Judge had to determine whether information sought is fact work product, and whether Carpenter met *Rule 26(b)(3)*'s "undue hardship" requirement; whether it was undiscoverable opinion work product; and whether it was relevant to this action.  *Nicholas*, 235 F.R.D. at 329.  Clearly, all of the communications at issue were prepared in connection with the underlying litigation and/or this litigation and addressed the coverage and duty to defend in the underlying action.  Carpenter was unable to identify any fact work product for which it meets *Rule 26(b)(3)*'s "undue hardship" requirement.  *In re Grand Jury Proceedings*, 33 F.3d at 348.  Therefore, Carpenter was not entitled to discover the subject materials which are protected by the work-product doctrine as well as the attorney-client privilege.

2.    *The communications at issue are irrelevant to the determination of the coverage issues.*

While Carpenter suggests that Westfield has somehow acted improperly and interfered with its discovery efforts by refusing to produce the subject communications with its counsel, Carpenter does not explain how the contents of those communications could be relevant to the coverage issues.  Regardless of what Westfield's counsel told Ms. (McConkey) Ellis, coverage either existed or it did not based upon the terms of the Westfield Policy and the allegations of the BOE's

Petition. For example, if Westfield's counsel told Westfield to deny coverage based on certain Policy provisions, that analysis, whether right or wrong, could not change the underlying facts or the language of Westfield's Policy. If Westfield's counsel was right, the Court will presumably agree based upon the facts and the law and decide the case in Westfield's favor. On the other hand, if Westfield's counsel was wrong, the fact that Westfield had received such advice would not change whether it was liable to defend and indemnify Carpenter. In the absence of any assertion of advice of counsel as a defense, the advice Westfield's counsel's gave does not change the Court's determination of the coverage issues in any way. While Carpenter's counsel appears to have a number of "conspiracy theories" regarding the subject communications, Carpenter has not explained how those communications could affect the coverage issue. They are simply irrelevant.

**D.    There was no evidence to support Carpenter's claims for "bad faith" and violations of the Unfair Trade Practices Act or its claims for punitive damages and the District Court properly granted Westfield summary judgment with respect to those claims.**

In conjunction with deciding the coverage issues, the District Court also correctly granted Westfield summary judgment with respect to order to Carpenter's "bad faith," Unfair Trade Practices Act and punitive damages claims. JA 2177. In that regard, under West Virginia law, if there is no coverage under a Policy, it

52

extinguishes any bad faith claim arising out of the denial of coverage pursuant to

*Jordache Enters., Inc. v. Nat'l Union Fire Ins. Co.*, 204 W. Va. 465, 484, 513 S.E.2d

692 (1998)(" Our case law is clear that in order for a policyholder to bring a common

law bad faith claim against his insurer, according to *Hayseeds, Inc. v. State Farm Fire*

*& Cas.,* 177 W. Va. 323, 352 S.E.2d 73 (1986), and its progeny, the policyholder must

first substantially prevail against his insurer on the underlying contract action.").

Because there is no coverage under the Westfield Policy for the reasons set forth

above, there is no basis for any claim of bad faith or any recovery of attorney's fees

or other damages by Carpenter.  Similarly, Carpenter's reliance upon *Pitrolo*, 176 W.

Va. 190, is misplaced because Westfield had a valid basis for its refusal to defend and

indemnify Carpenter under the terms of its Policy.  In that regard, the Court in *Pitrolo*

noted:

> Most Courts have held that where an insured is required to retain counsel
> to defend himself in litigation because his insurer has refused **without**
> **valid justification** to defend him, in violation of its insurance policy, the
> insured is entitled to recover from the insurer the expenses of the
> litigation, including costs and reasonable attorney's fees. . .**The theory**
> **for allowing this recovery is that these damages directly resulted**
> **from the insurer's breach of contract**.

*Id.*, 176 W. Va. at 193 (citations omitted).  Here, as discussed above at length,

Westfield had a valid justification for its decision to refuse to defend or indemnify

Carpenter and did not breach its contract by doing so.

The existence of a valid basis for refusing coverage also defeats Carpenter's claims for punitive damages. The West Virginia State Supreme Court addressed the issue of punitive damages in the context of insurance bad faith in the cases of *Hayseeds*, and *McCormick v. Allstate Ins. Co*, 202 W. Va. 535, 505 S.E.2d 454 (1998), and indicated that a claimant must present evidence of actual malice in order to support a claim for punitive damages. The Court in *Hayseeds* stated, "[b]y 'actual malice' we mean that the [insurance] company actually knew that the policyholder's claim was proper, but willfully, maliciously and intentionally denied the claim." (footnote omitted). *Hayseeds*, 177 W. Va. at 330-31. In *McCormick*, the Court noted:

> We see no reason why this Court should abandon the "actual malice" standard, with its focus on the insurer's treatment of the policyholder, where, as int eh case *sub judice*, a first-party claim is asserted under the Unfair Claim Settlement Practices Act.

*McCormick*, 505 S.E.2d at 459. The Court went on to state:

> By "actual malice" we mean that the insurance company actually knew that the policyholder's claim was proper but willfully, maliciously and intentionally utilized an unfair business practice in settling or failing to settle, the insured's claim.

*Id*. Thus, a showing of actual malice would be necessary before Carpenter could recover punitive damages for any alleged "bad faith" or violations of the West Virginia Unfair Trade Practices Act during the handling of the subject claim. Here, the evidence clearly establishes that Westfield denied coverage for the claims against

54

Carpenter based upon the fact that those claims concerned a request for declaratory relief and a contract dispute related to Carpenter's work under its contract with the BOE, rather than an accident or occurrence causing property damage. Westfield certainly did not "know" that the BOE's claims were covered but deny coverage anyway. Instead, Westfield continues to maintain that the BOE's claims are not covered and has substantial evidence to support its position. (See the evidence discussed above.) In fact, the *Cherrington* decision upon which Carpenter mistakenly relies was not even issued until after Westfield had denied coverage in this case. (See JA 511-533, the May 7, 2013 denial letter.) Therefore, Carpenter has no evidence to support its "bad faith" and Unfair Trade Practices Act claims or its claims for punitive damages and the District Court properly granted Westfield's request for summary judgment on those claims.

## CONCLUSION AND REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellee Westfield Insurance Company asks the Court to affirm the District Court's Order entered September 17, 2014, because the Order properly granted summary judgment to Westfield with respect to all of Carpenter Reclamation, Inc.'s claims.

Plaintiff-Appellee does not believe oral argument is necessary, but instead believes that the matters in dispute can be fully resolved by the Court through the briefing.

Respectfully submitted,

WESTFIELD INSURANCE COMPANY,

By Counsel

*/s/ Brent K. Kesner*
Brent K. Kesner
bkesner@kesnerlaw.com
Kesner & Kesner, PLLC
P. O. Box 2587
Charleston, WV  25329
304-345-5200
*Counsel for Plaintiffs-Appellee*

56

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 14-2027    **Caption:** Westfield Insurance Co. v. Carpenter Reclamation, Inc.

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓] this brief contains _____12,177_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓] this brief has been prepared in a proportionally spaced typeface using
   WordPerfect 12 [*identify word processing program*] in
   Times New Roman, 14 point font [*identify font size and type style*]; **or**

   [ ] this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) Brent K. Kesner

Attorney for Appellee

Dated: 1/20/15

# CERTIFICATE OF SERVICE

I certify that on  1/20/15  the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Carl J. Roncaglione, Jr.
1018 Kanawha Boulevard, East
Boulevard Tower, Suite 401
Charleston, WV 25301-0000
304-342-3945
carljroncaglionejr@yahoo.com

/s/ Brent K. Kesner

Signature

1/20/15

Date